RECEIVED

SEP 2 4 2013

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| DIAMOND SERVICES CORP. | CIVIL ACTION NO. 6:11-cv-0772 |
| VERSUS | JUDGE DOHERTY |
| THE BRITISH EUROPEAN AND OVERSEAS P&I INSURANCE, ET AL | MAGISTRATE JUDGE HILL |

## MEMORANDUM RULING

Currently pending before the Court is a motion for summary judgment [Docs. 91], filed by defendants, Catlin Insurance Company and Certain Underwriters at Lloyd's, London. By way of their motion, defendants seek dismissal of all claims asserted against them by plaintiff Diamond Services Corporation ("Diamond"), asserting the bumbershoot insurance policy issued by defendants to plaintiff does not provide coverage for the claims asserted herein. By separate motion [Doc. 113], defendant Fireman's Fund Insurance Company seeks summary judgment on the same grounds, adopting the arguments asserted by Catlin and Lloyds as its own.[1] For the following reasons, the motions are GRANTED.

I. **Factual Background**

The following facts are not in dispute for purposes of this motion. Diamond owns and operates several maritime vessels, including a crane barge designated SF-2200 and a lay barge

---

[1] According to the documents submitted by counsel, Catlin Insurance Company, Certain Underwriters at Lloyd's London, and Fireman's Fund Insurance Company (collectively "Underwriters") each subscribed as co-insurers to a bumbershoot policy insuring plaintiff. [Doc. 42, ¶ 7; Doc. 91-2, p. 2; Doc. 110, ¶ 1]

1

designated D-85. [Docs. 91-1, p. 1; 100, p. 1] As a result of high seas on December 13, 2009, the equipment room of the D-85 was flooded, and the SF-2200 was grounded at Chandelier Island, off the coast of Louisiana. [Docs. 1-1, ¶ 10; 91-1, p. 1; 100, p. 2] Thereafter, Diamond successfully floated the SF-2200 and repaired the damage to the D-85. [Doc. 100, p.2]

At the time of this incident, Diamond had the following types of insurance protection: Hull & Machinery ("H&M"), General Liability, Automobile Liability, Pollution Liability, Employers Liability, Maritime Employers Liability, Protection & Indemnity, Collision/Towers Liability, and Bumbershoot coverage. [Doc. 91-2, p.5, Doc. 100, p.1] With the exception of Diamond's H&M policy, the remaining coverages are all listed on the "Schedule of Underlying Insurances" attached to the bumbershoot policy issued by Underwriters. [Doc. 91-2, p.5]

As pertinent to the pending motions, by way of this suit, Diamond asserts it has submitted claims for damages to Underwriters for reimbursement of the costs incurred in attempting to free the SF-2200 from its grounding and in repairing the damage to the D-85.[2] Diamond further asserts Underwriters "have refused to adequately adjust the claims and timely pay the sums due their insured." [Doc. 1-1, ¶¶ 13, 16] All parties agree the claims submitted by Diamond are first party H&M claims. [Doc. 91-1, p.2; Doc. 37-1, p.12] By this motion, Underwriters assert that no coverage is available under the bumbershoot policy for first party H&M claims. Contrarily, Diamond asserts the bumbershoot policy does provide coverage for the first party property claims asserted in this suit "due to ambiguity in the policy." [Doc. 100, p. 6] Diamond appears to impliedly concede the scope of coverage set forth in the policy issued by Underwriters does not provide coverage for its claims,

---

[2] Diamond additionally sued its H&M carrier for the damages incurred by the SF-2200 and the D-85. Since the filing of this suit, Diamond has settled its claim against its H&M carrier. [Doc. 100, p.5; *see also* Doc. 103]

but argues a "conditional exclusion" contained within the policy creates an ambiguity, and thus summary judgment is improper. [Doc. 100, pp. 7-8]

## II. Applicable Law

"The interpretation of a marine policy of insurance is governed by relevant state law, which in this case is Louisiana law." *Cal–Dive Int'l, Inc. v. Seabright Ins. Co.*, 627 F.3d 110, 113 (5th Cir.2010); *see also In re Complaint of Taira Lynn Marine Limited Number 5 L.L.C.*, 420 Fed.Appx. 330, 335 (5th Cir. 2011); *In re Matter of Complaint of Settoon Towing, LLC*, 720 F.3d 268, 276, 279 (5th Cir. 2013).[3] "Under Louisiana law, an insurance policy is a contract between the parties and should be interpreted according to the general rules of interpretation of contracts prescribed in the Louisiana Civil Code." *Nunez v. Allstate Ins. Co.*, 604 F.3d 840, 844–45 (5th Cir.2010) (citation omitted). The words of an insurance contract are not to be read in isolation, as "[e]very insurance

---

[3]The Court is cognizant of other Fifth Circuit opinions, expanding upon the choice of law determination for marine insurance contracts:

> [T]he Fifth Circuit has ruled that the interpretation of a contract of marine insurance is—in the absence of a specific and controlling federal rule—to be determined by reference to appropriate state law. This presumption of state law is, by now, axiomatic. State law, therefore, governs the interpretation of marine insurance policies unless an available federal maritime rule controls the disputed issue. This Circuit has identified three factors that a court should consider in determining if a federal maritime rule controls the disputed issue: (1) whether the federal maritime rule constitutes entrenched federal precedent, (2) whether the state has a substantial and legitimate interest in the application of its law, (3) whether the state's rule is materially different from the federal maritime rule.

*Albany Ins. Co. V. Anh Thi Kieu*, 927 F.2d 882, 886 (5th Cir. 1991)(internal quotation marks and citations omitted); *see also e.g. 5801 Associates, Ltd. v. Continental Ins. Co.*, 983 F.2d 662, 665 (5th Cir. 1993). This Court has not located, nor has any party identified, any specific and controlling federal rule pertinent to this matter. Accordingly, the Court will review the insurance policy in accordance with the substantive law of Louisiana. *See e.g. Gabarick v. Laurin Maritime (America), Inc.*, 649 F.3d 417, 421 (5th Cir. 2011)(Where no federal law relating to the issue in question exists, the law of the state where the marine insurance policy was issued and delivered is the governing law).

3

contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." La.Rev.Stat. Ann. § 22:881. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ.Code Ann. art. 2046. "The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." La. Civ.Code art. 2047.

"When determining whether or not a policy affords coverage for an incident, it is the burden of the insured to prove the incident falls within the policy's terms." *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 124. "On the other hand, the insurer bears the burden of proving the applicability of an exclusionary clause within the policy." *Id.*; *see also Martco Ltd. v. Wellons, Inc.*, 588 F.3d 864, 880 (5th Cir.2009).

### III. Analysis

By their motion, Underwriters assert the bumbershoot policy issued to Diamond provides no coverage for the claims asserted herein, as the policy solely "provides coverage for Diamond's liabilities - sums Diamond is 'obligated to pay' to third-parties - not for Diamond's own losses." [Doc. 91-1, pp. 3-4] Again, Diamond has admitted the claims at issue are first party property claims.[4] [Doc. 37-1, p.15; Doc. 60, p.11]

The policy issued by Underwriters provides in pertinent part as follows:

---

[4] "First-party" insurance covers a loss sustained by the insured (*i.e.* the first party to the insurance contract), such as property insurance; "liability" or "third-party" insurance covers the insured's liability to a third party (*i.e.* a non-party to the insurance contract) for the third party's loss. *See e.g. TCC Contractors, Inc. v. Hospital Service Dist. No. 3 of Parish of Lafourche*, 52 So.3d 1103, 1110, n.6 (La. App. 2010)(citing *Black's Law Dictionary* 817, 1518 (8th ed. 2004)).

4

## INSURING AGREEMENT

1. **COVERAGE**

    This Policy is to indemnity [sic] the Assured in respect of the following (including such expenses as are set out in the definition of "ULTIMATE NET LOSS"):

    (a) All Protection and Indemnity risks. . . .

    (b) General Average, Collision Liabilities, Salvage, Salvage Charges and Sue and Labour. . . .

    (c) All other sums which the Assured shall become legally liable to pay or by contract or agreement become liable to pay in respect of claims made against the Assured for damages of whatsoever nature, on account of:

      (i) Personal injuries. . . .

      (ii) Property Damage,

    caused by or arising out of each occurrence happening anywhere in the world.

    . . . .

2. **LIMIT OF LIABILITY - UNDERLYING LIMITS**

    Underwriters hereon shall only be liable for the excess of either:

    (a) The amount(s) of the limit(s) set out in underlying insurances identified in the attached Schedule (with respect to General Average, Collision Liabilities, Towers Liabilities, Salvage, Salvage Charges, Sue and Labour expenses and Protection and Indemnity, the sum(s) of said expenses and liabilities actually insured under the underlying policies shall be deemed the amount(s) of the limit(s) of said underlying policies).

    or

    (b) $100,000.00 Ultimate Net Loss in respect of each occurrence not covered by said underlying insurances (all hereinafter called the "Underlying Limits")
    . . . .

[Doc. 91-2, p.8, *as amended* at p. 14] The policy defines "Ultimate Net Loss," in pertinent part, as

5

"[t]he total sum which the Assured becomes *obligated* to pay by reason of matters set Out in Insuring Agreement 1...." [Id. at 9 (emphasis added); *see also* id. at 14] "Property Damage" is defined as "loss of or direct damage to or destruction of tangible property (*other than property owned by the Named Assured*)." [Id. at 20 (emphasis added)] "Occurrence" is defined in pertinent part as "an event or a continuous or repeated exposure to conditions which unintentionally causes injury, damages or destruction during the policy period." [Id. at 14]

Plaintiff has made no argument that its claims would fall under coverage provisions (1)(a), (1)(b), or (1)(c)(I). Accordingly, if coverage is available, it is available by virtue of section (1)(c)(ii), which provides for indemnification for "[a]ll other sums which the Assured shall become *legally liable* to pay or by contract or agreement become *liable* to pay in respect of *claims made against the Assured for damages* of whatsoever nature, on account of: ... Property Damage...." [Id. (emphasis added)]

Underwriters argue the bumbershoot policy is a policy of liability insurance, which by definition (as well as the explicit language of the policy), solely provides protection to an insured from its liability to third parties.[5] In support, Underwriters point to the phrase, "[t]his Policy is to

---

[5] "A 'bumbershoot' is '[a] marine insurance policy covering multiple *liability* coverages in excess of one or more different underlying policies (comparable to the Commercial Liability Umbrella covering liabilities on land)." *St. Paul Travelers Companies, Inc. v. Corn Island Shipyard, Inc.*, 495 F.3d 376, 379 n.1 (7th Cir.2007)(emphasis added)(quoting *Glossary of Marine Insurance and Shipping Terms*, 14 U.S.F. Mar. L.J. 308, 325); *see also* Robert T. Lemon II, *Allocation of Marine Risks: An Overview of the Marine Insurance Package*, 81 Tul. L.Rev. 1467, 1489–90 (2007)(footnoted citations omitted; emphasis added)("The 'bumbershoot' policy is a marine 'umbrella cover,' which provides general *liability* coverage of a marine nature.") *See also* La. R.S. 22:47(4)(b)(liability insurance provides "coverage that provides indemnity, on behalf of an insured, for any legal responsibility from the damage to or the destruction of *another person's property*....")(emphasis added); *Medical Research Centers, Inc. v. St. Paul Property and Liability Ins.*, 303 F.Supp.2d 811, 814 (E.D.La. 2004) (Liability insurance is "an indemnification policy that protects the insured from its liability to third parties"); *Hull v. Allstate Ins. Co., Inc.*, 682 F.Supp. 867, 868 (M.D.La. 1988)("'Liability insurance' has over the years come to be accepted in the courts as meaning an indemnity agreement which protects the insured against his liability

6

indemni[f]y the Assured in respect of . . . All other sums which the Assured *shall become legally liable to pay*. . . on account of: Property Damage," as well as to the definition of "property damage," which expressly excludes property "*owned by the Named Assured.*" [Id. at 4-5 (emphasis added)] Underwriters argue nothing in the policy "extends coverage to the assured's own property or first-party losses." [Id. at 5] Underwriters continue, "If liability attaches, the Bumbershoot Policy provides coverage for the assured's 'Ultimate Net Loss,' defined in part as "[t]he total sum which the Assured becomes *obligated* to pay by reason of matters set Out in Insuring Agreement 1. . . . ." [Id. at 5 (emphasis added)] Underwriters argue the phrase, "which the Assured becomes obligated to pay" demonstrates the "policy responds to liabilities," and not first-party claims. [Id.] Because the expenses Diamond incurred were for damages to its own property (and not for sums Diamond was "obligated to pay" or "legally liable to pay"), the policy provides no coverage. [Id.]

Contrarily, Diamond asserts the bumbershoot policy does provide coverage for the first party property claims asserted in this suit "due to ambiguity in the policy." [Doc. 100, p. 6] As previously noted, Diamond appears to impliedly concede the scope of coverage set forth in the "Coverage" section of the policy does not provide coverage for Diamond's claims, but argues the "conditional exclusions" contained within the policy create an ambiguity, and thus summary judgment is improper. [Id.] According to Diamond, "the Conditional Exclusions found in Bumbershoot Supplement provision should be interpreted to supplant the 'Property Damage' Definition because the heading states that the terms in the section 'supersede any inconsistent policy provisions.'" [Doc. 100, p.6] Diamond then quotes the following portion of the section entitled "Conditional

---

to others."); *TCC Contractors, Inc. v. Hospital Service Dist. No. 3 of Parish of Lafourche*, 52 So.3d 1103, 1110, 1115 (La. App. 2010)(distinguishing first-party property coverage policies from liability/indemnity policies).

7

Exclusions":

> As respects all activities of the Assured (except liability arising out of ownership, charter, use, operation, maintenance, loading, unloading or as a bailee of any watercraft not otherwise excluded or limited herein), this insurance shall be free from liability (unless coverage is provided in an underlying policy scheduled hereon, and then coverage hereunder shall only operate as excess of such coverage).

[Doc. 100, pp. 6-7] Diamond does not in any manner identify how the quoted provision creates an ambiguity, it does not identify what it finds ambiguous about the policy and/or this particular provision, nor does it state how the quoted provision is "inconsistent" with the policy's definition of "Property Damage." Rather, Diamond merely notes a ruling issued out of the Southern District of New York, which found the provision at issue to be ambiguous. *See Reliance Ins. Co. v. Keystone Shipping Co.*, 102 F.Supp.2d 181 (S.D.N.Y. 2000). Diamond concludes, "Given the fact that the policy has ambiguities, the granting of Underwriters' Motion for Summary Judgment is improper." [Doc. 100, p.8]

In *Reliance*, Underwriters of a bumbershoot policy sought a judgment declaring they were not required to indemnify their assured for costs the assured incurred during arbitration and settlement of a claim brought by a third party, who had sued the assured for a damaged ship the assured sold them under a buy-out provision of a charter agreement. Because the assured's underlying insurances did not provide coverage for the incident[6], the dispute centered around "the

---

[6] The Assured's P&I carrier denied coverage on the basis that "the vessel's damage concerned wear and tear damage to the assureds' own property"; the H&M carrier denied coverage because the vessel's damage "did not arise from losses sustained as the owner of the vessel," but rather arose out of the assured's "contractual indemnity" to the purchaser of the vessel. *Id.* at 185-86 (internal quotation marks omitted).

8

scope of the bumbershoot policy's drop down provisions."[7] *Id.* at 184. The bumbershoot provider denied coverage, in part, on the basis that the damage to the vessel occurred while still owned by the assured, and therefore, the damages "did not constitute third party liability." *Id.* at 186. The Underwriter asserted, and the court ultimately agreed, that the damage to the vessel "resulted from normal wear and tear" to the assured's own property. [*Id.* at 191-92]

The court then turned its focus to whether "wear and tear damage" to an assured's own property "should be construed as falling within the policy terms." *Id.* at 192. All provisions at issue in *Reliance* were identical to those before this Court. *Id.* at 192-93. Like the matter before this Court, the Underwriter in *Reliance* argued coverage was not available in light of the policy's definition of "property damage," which excluded "property owned by the Named Assured." *Id.* at 193; *see also* Doc. 91-2, p.20. The assured argued the "Conditional Exclusion," contained in the "Bumbershoot Supplemental Clauses" (*i.e.* the same provision upon which Diamond relies), "creates an exception allowing the assured to make a claim for property damage to his own property when the damage results from a charter dispute." *Id.* at 193. In support of its position, the assured (like Diamond) pointed to the preface to the Bumbershoot Supplementary Clauses, which "indicates that the terms contained therein 'supercede any inconsistent Policy provisions.'" *Id.*

The *Reliance* court found as follows:

> One interpretation of the "Conditional Exclusions" provision is that it establishes that the insurers will indemnify the assureds for disagreements stemming from a charter dispute, as long as these disagreements are "not otherwise excluded

---

[7]"Drop down coverage 'occurs when an insurance carrier of a higher level of coverage is obligated to provide the coverage that the carrier of the immediately underling level of coverage has agreed to provide.'" *Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Company*, 630 So.2d 759, 760, n.1 (quoting *Fred Weber, Inc. v. Granite State Ins. Co.*, 829 S.W.2d 589, 590, n.2 (Mo.App. 1992)).

or limited" by the language of the Policy. Under this reading, since the definition of "Property Damage" in the policy excludes property owned by the assured, the assured would not be covered for damage to his own property even when it is involved in a charter dispute. *Indeed, this seems the most straightforward reading of the policy.*

However, another interpretation of this clause places more emphasis on the Bumbershoot Supplementary Clauses' preface, which states that all bumbershoot provisions "supercede any inconsistent policy provisions." Under this reading, the "Conditional Exclusions" section is read to bind the insurer regardless of other stated exclusions in the policy, thus making any charter agreement dispute covered under the policy, regardless of who owns the chartered property. In the court's view, both of these interpretations are reasonable, and therefore the policy terms are ambiguous. In light of this ambiguity, the court turns to extrinsic evidence to determine the clauses' meanings.

*Id.* at 193-94 (citations omitted; emphasis added). Ultimately, the court held, "In summary, [Underwriters] have shown that the standard use of the word occurrence in a marine bumbershoot policy with drop down coverage refers to damage the assured inflicts on a third party, and therefore [the assured's] claim for first party property damage is not covered under the policy." *Id.* at 196.

This Court finds the *Reliance* decision to be factually distinguishable, as it involved drop down coverage for a charter dispute, rather than excess coverage for a first party property damage claim. However, to the extent plaintiff argues the same result should follow (regardless of the factual distinctions), this Court respectfully disagrees with the argued interpretation of the *Reliance* court, as it does not find the cited provisions to be ambiguous when applied *to the facts before this Court*, nor does it find the "Conditional Exclusions" to be inconsistent with the definition of "Property Damage," for the reasons that follow. Although, clearly poorly written, and perhaps arguably ambiguous when applied to a certain set of facts, the poorly drafted exclusion does not provide the avenue to relief argued in this case when it is read in its entirety. The provision upon which Diamond relies reads, in its entirety, as follows:

## BUMBERSHOOT SUPPLEMENTARY CLAUSES

The following provisions shall supersede any inconsistent policy provisions.

## CONDITIONAL EXCLUSIONS

As respects all activities of the Assured (except liability arising out of ownership, charter, use, operation, maintenance, loading, unloading or as a bailee of any watercraft not otherwise excluded or limited herein), this insurance shall be free from liability (unless coverage is provided in an underlying policy scheduled hereon, and then coverage hereunder shall only operate as excess of such coverage):

(a) from operation, ownership, use of any automobile, truck or aircraft:

(b) from any employee with respect to personal injury to death of another employee of the same employer injured in the course of such employment:

(c) for damage, loss, or expense to property of others which occurred while in the care, custody or control of the Assured hereunder:

(d) assumed under contract:

(e) arising out of goods or products manufactured, sold, handled or distributed by the Assured or by others trading under his name (hereinafter called "the Assured's Products") if the occurrence occurs after possession of such goods or products has been relinquished to others by the Assured or by others trading under his name and if such occurrence occurs away from premises owned, rented or controlled by the Assured; provided such goods or products shall be deemed to include any container thereof, other than a vehicle, but shall not include any vending machine or any property, other than such container, rented to or located for use of others but not sold:

(f) arising out of operations, if the occurrence occurs after such operations have been completed or abandoned and occurs away from premises owned, rented or controlled by the Assured; provided that operations shall not be deemed incomplete because improperly or defectively performed or because further operations may be required pursuant to an agreement; provided further the following shall not be deemed to be "operations" within the meaning of this paragraph:

(1) pick-up or delivery, except from or onto a railroad car;

11

  (2) the maintenance of vehicle owned or used by or on behalf of the Assured;

  (3) the existence of tools, uninstalled equipment and abandoned or unused materials;

(g) arising out of punitive, treble and/or exemplary damages.

[Doc. 91-2, p.15]

A review of *the entire provision* reveals the provision(s) exclude(s) seven specific areas from coverage, *unless* those areas are covered by "underlying insurance *identified in the attached Schedule*" - hence, the title "Conditional Exclusions."[8] (emphasis added)[Doc. 91-2, pp. 8, 14, 15] *See e.g. Torch Operating Co. v. M/V Blanche Candies*, 1993 WL 455584, *2 (E.D.La.) (characterizing the language of an identical provision as: "Language providing indemnification only if there is underlying coverage is found in the conditional exclusions of the present bumbershoot policy.") This Court agrees, a reading of the full provision(s) is/are required. In this matter, plaintiff's claims are not covered by an "underlying insurance identified in the attached Schedule," as the "Schedule of Underlying Insurances" *does not include Hull & Machinery* coverage. [Doc. 91-2, p.5]

When the section of the policy entitled "Conditional Exclusions" is, also, read in conjunction with the policy as a whole, it is readily apparent these exclusions restrict and/or limit the liability coverage found in the Insuring Agreement, rather than expand coverage to include first-party property claims. In sum, the Court does not find plaintiff's interpretation of the policy to be logical or reasonable when one reads the argued provisions in their entirety and the provisions within the context of the policy as a whole. The purpose of the section entitled "Conditional Exclusions" when read in its entirety, is to *further* restrict the scope of *liability* coverage granted in the "Coverage"

---

[8]This section is immediately followed by a section entitled "Absolute Exclusions." [Id.]

section of the policy. *See e.g. Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 (La. 1994)("An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Absent a conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability and to impose and to enforce reasonable conditions upon the policy obligations they contractually assume.") In this instance, when the provisions are read as a whole and the policy read as a whole, no ambiguity between the exclusions and the policy exists.

Finally, to the extent plaintiff contends Underwriters "must provide 'drop down' coverage for the claims asserted herein," plaintiff has failed to carry its burden and show a genuine issue of material fact exists as to whether the policy provides drop down coverage. Plaintiff argues it "was forced to settle" with its underlying insurer, because plaintiff was unsuccessful it its effort to have this matter remanded to state court. [Doc. 100, p.5] Based upon that fact alone, plaintiff argues Underwriters must provide drop down coverage. [Id.] To the extent plaintiff might have properly placed the issue of drop down coverage before this Court, plaintiff has failed to carry its burden. *See e.g. Kelly v. Weil*, 563 So.2d 221, 222 (La. 1990)(Policies which "describe the excess coverage as the excess of the limits of the policies 'covered' in schedules attached to the policy" do not provide for drop down coverage); *Lumar Marine, Inc. v. Insurance Company of North America*, 910 F.2d 1267, 1272 (5th Cir. 1990); *Mission Nat. Ins. Co. v. Duke Transp. Co., Inc.*, 792 F.2d 550 (5th Cir. 1986); *Insurance Company of North America v. West of England Shipowners Mutual Insurance Association*, 890 F.Supp. 1292, 1295 (E.D.La. 1995)("Because the provision does not premise coverage on whether claims are *recoverable* or collectible under the primary policy, but rather on

13

whether the claim falls within the terms of coverage of the primary policy, the language does not give rise to drop-down coverage.")(emphasis in original); *Radar v. Duke Transp. Inc.*, 492 So.2d 532 (La.App. 1986); *see also* Doc. 91-2, p.8 ("Limit of Liability - Underlying Limits"), p.12 ("Other Insurance"), p.13 ("Maintenance of Underlying Insurance").

In light of the foregoing, the Court finds plaintiff has failed to meet its burden to show a genuine issue of fact exists, or that its claims fall within the policy's grant of coverage. Accordingly, the motions for summary judgment [Docs. 91, 113] filed by Catlin Insurance Company, Certain Underwriters at Lloyd's London, and Fireman's Fund Insurance Company are hereby GRANTED, and the claims asserted against them by plaintiff Diamond Services Corporation are DISMISSED.

THUS DONE AND SIGNED in Lafayette, Louisiana, this 23 day of September, 2013.

_____
REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE